IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ACEROS RECICILABLES DE MEXICO, )
S.A. de C.V. and HARTWELL          )
PACIFIC LIMITED,                   )
          Plaintiffs,              )
                                   )
     v.                            ) Civil Action No. 02-1935
                                   )
ELG HANIEL METALS CORP. and        )
ELG SOUTHERN, INC.                 )
          Defendants.              )

MEMORANDUM ORDER

Gary L. Lancaster,                                March 13, 2006
District Judge.

     This is a contract action.  In Count I, plaintiffs allege

that defendants, ELG Haniel Metals Corp. and ELG Southern, Inc.

(collectively, "ELG"), breached their promise to purchase

plaintiff's scrap metal plant located in Mexico.  As an

alternative to their breach of contract claim, plaintiffs allege

two equitable claims: promissory estoppel (Count II) and unjust

enrichment (Count III).  In Count IV, plaintiffs claim that

defendants made several negligent misrepresentations regarding

the alleged agreement to purchase plaintiffs' plant.

     Defendants have filed a motion for summary judgment under

Fed. R. Civ. P. 56(c).  Specifically, defendants argue that

plaintiffs' breach of contract claim must fail because the

parties never entered into a binding agreement to purchase.

Defendants argue that plaintiffs' equitable claims must be dismissed because claims for promissory estoppel and unjust enrichment can only exist in the absence of a contract. Defendants argue that plaintiffs' negligent misrepresentation claim is barred by the "gist of the action" action and/or the economic loss doctrine.

In opposition to defendants' motion for summary judgment as to the breach of contract claim, plaintiffs argue that a jury must determine whether a binding contact existed, and if so, the terms thereof. Plaintiffs argue that defendants promised to purchase their plant and set forth the terms of the parties' agreement in a Letter of Intent. Plaintiffs further argue that the parties entered into a Tolling Agreement based on the understanding that a final purchase agreement would be forthcoming. Plaintiffs argue that their equitable claims are not appropriate for summary judgment because these claims should go to the jury as a alternative grounds of relief to their breach of contract claim. Finally, plaintiffs argue that their fraudulent misrepresentation claims are not appropriate for summary judgment because whether plaintiffs reasonably relied on defendants' statements concerning the sale is a jury question per Pennsylvania law.

For the reasons that follow, the defendants' motion for summary judgment is GRANTED.

2

I.    BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Prior to its liquidation in 2001, plaintiff Aceros was a Mexican company in the business of recycling scrap metal. Aceros purchased scrap metal from Mexican vendors, processed the scrap metal in its facility in Guadalajara, Mexico, and sold the processed metal to third party consumers. Aceros was a wholly-owned subsidiary of Hartwell, founded in May of 1999 by Stephen Greer. Plaintiffs allege that Aceros soon became defendant ELG's principal competitor. ELG did not have a scrap metal processing facility in Mexico at that time.

Defendant ELG is a Texas corporation with its principal place of business in Houston, Texas. At all times relevant to this action, Fredrich Teroerde was the Board Chairman and Chief Executive Officer of ELG. Mr. Teroerde of ELG and Mr. Greer of Aceros have a long-standing personal and professional relationship.

In April 2001, ELG contacted Mr. Greer to express interest in purchasing Aceros. On June 24, 2001, Aceros received a proposed Letter of Intent ("LOI") from ELG. The LOI states, "We hereby submit for consideration of Aceros...the following proposal relating to the purchase by ELG...of all the Assets of [Aceros]." Under the section entitled, "Purchase Price," the LOI

3

states as follows:

> 2.  Purchase Price. Subject to the conditions
> and assumptions set forth in Sections 3,4, and 5
> below, the purchase price for the Assets of
> [Aceros] will be $925,000...to be allocated among
> the Assets, goodwill and the noncompetition
> agreements of the Seller and Stephen Greer
> ("Greer") in accordance with the terms of the
> definitive Transaction documents.

As referenced above, Sections 3, 4, and 5 set forth various
requirements before the purchase could be completed. Section 3,
which is entitled, "Resolution of Certain Matters," addresses
business operational matters that must be resolved prior to or
at the time of the closing of the transaction. Similarly,
Section 4, entitled, "Assumptions," sets forth four assumptions
made by ELG in arriving at the proposed purchase price. For
example, Section 4 addressed such concerns as outstanding
liabilities.

Section 5, which is entitled, "Conditions," is most
pertinent to this dispute. It states, "the proposed purchase of
the Assets will be subject to the fulfillment of the following
conditions...." One of the five conditions set forth in Section
5, is, "final approval of the Transaction documents by the
shareholders and Boards of Directors/Management Boards of the
parties." As such, plaintiffs were aware that any agreement to
purchase the assets of Aceros would require ELG Board approval.

4

Also worth noting is Section 7, which is an overview of the effect of the parties' signatures to the LOI. In sum, Section 7 states that so long as ELG is "continuing in its efforts to complete the proposed Transaction, and in consideration of the statement of value described herein, until the end of September 30, 2001, [Aceros] will not directly or indirectly," solicit, encourage, or initiate any other offers from other potential buyers.

Most critical to this dispute is Section 10 of the LOI, which is entitled "Binding Effect." It states:

> 10. Binding Effect. It is not the intention of the parties hereto that this letter be deemed to constitute: (a) a legally binding obligation of either party, except with respect to Sections 6,7,8, and 10 hereof or (b) an obligation or commitment of either party to enter into definitive Transaction documents.

As referenced above, the parties intended only sections 6,7,8, and 10 of the LOI to be binding. Those sections addressed "Confidentiality," "Effect of Execution," "Expenses," and "Binding Effect," respectively.

On behalf of their respective companies, Mr. Greer and Mr. Teroerde executed the LOI in July 2001. Plaintiffs claim that when Mr. Greer signed the LOI, he did so with the expectation that the asset sale would be finalized promptly. Based on this expectation, plaintiffs permitted ELG personnel to operate the Aceros facility beginning in August 2001.

5

At that time, Mr. Greer contacted Mr. Teroerde for assurances that the asset purchase deal would be forthcoming. In an email to Mr. Teroerde dated August 3, 2001, Mr. Greer stated:

> Hi Fritz, It is official. You are the guy I trust more than anyone in the world. [ELG personnel] are arriving Sunday night and will be working inside our company to negotiate, purchase, process, and store scrap. I am told by [ELG Metals President] Andy [Wilk]...that everything is a done deal and that the only thing we are waiting for is the incorporation of the new ELG company so that they can officially run a business in Mexico. There is only one thing missing. I never received...a draft of the final agreement. My understanding is that the draft agreement was supposed to be ready last week. That is more important to me than the letter of intent as the letter of intent, I was told, is non-binding anyway.

See Plaintiff's Exhibit 43. Mr. Teroerde responded by assuring Mr. Greer that he should "have a sound sleep" because defendants' board of directors "have an official ELG Board meeting to nod on Mexico...on the 20th of August," and that he had already taken steps to assure that the Board would approve the deal. See Plaintiffs' Exhibit 44.

Plaintiffs claim that because of the assurances made by Mr. Teroerde that the deal would be finalized by the end of August, Aceros allowed defendants to take over its facility in August 2001. Because defendants' Board still had not approved the final purchase deal by the end of August 2001, plaintiffs instructed defendants that ELG could no longer ship and sell

6

scrap from plaintiffs' facility. Plaintiffs instructed defendants' personnel to leave the Mexican facility by August 30, 2001. See Plaintiffs' Exhibit 9. Plaintiffs claim that they were prepared to resume operations of their facility and seek a new purchaser.

At that time, defendants needed to regain access to plaintiffs' facility in order to satisfy some outstanding orders. Plaintiffs refused to allow ELG back into the Aceros facility without further assurances from defendants that they would in fact purchase Aceros. Plaintiffs claim that in late August 2001, defendants assured them that all of the preconditions to sale had been met with the exception of ELG board approval, and that board approval would be forthcoming promptly. See Plaintiffs' Exhibit 5.

Messrs. Greer and Teroerde negotiated and jointly drafted the terms of a "Tolling Agreement" on behalf of Aceros and ELG. The parties executed the Tolling Agreement on September 25, 2001. The Tolling Agreement is a four-page document that defines itself as follows:

> "Tolling Arrangement" while ELG waits for a more opportune time to present the acquisition plan for the assets etc. of Aceros Recyclables per the "letter of Intent" signed July 24, 2001.

The parties dispute whether the first page of the document is actually part of the Tolling Agreement because the parties apparently renumbered and initialed the remaining three pages

7

as what appears to be a separate document. Nevertheless, page one sets forth "Guiding Principals," which state that the Tolling Agreement is not intended to replace the "original acquisition deal as written in the Letter of Intent," that ELG would endeavor to execute the acquisition of the Aceros assets at the earliest possible date, and that the terms of the original deal were "firm." See Plaintiffs' Exhibit 17.   The second page of the Tolling Agreement states that, "ELG will pay US$20,000 per month directly to [plaintiffs] as a separate 'tolling' fee for operating the business." Id.

Plaintiffs contend that in exchange for and because of the commitments made by defendants, plaintiffs permitted ELG to resume processing scrap metal in Aceros's facility. Plaintiffs claim that the Tolling Agreement did not contain a termination provision because it was only an interim measure pending a final asset sale, and that it would terminate upon completion of the asset purchase. Defendants contend that the Tolling Agreement was terminable at will.

Defendants claim that they lost money under the Tolling Agreement. In June 2002, defendants notified plaintiffs that they were terminating the Tolling Agreement on June 30, 2002. Plaintiffs claim that because defendants abandoned the Aceros plant after running it for months, the value of plaintiffs' unique knowledge of the Mexican market was destroyed and

8

plaintiffs could not sell their plant to a third party.

II.  STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (internal quotation marks omitted).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Id. at 247-48.  A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment.  Id. at 248.  Similarly, summary judgment is improper so long as the dispute over the material facts is genuine.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

It is on this standard that the court has reviewed

9

defendants' motion and plaintiff's response thereto.  Based
on the pleadings and evidence of record, the briefs filed in
support and opposition thereto, and the arguments of counsel,
the court concludes, as a matter of law, that there are no
remaining issues of genuine material fact to preclude the
entry of summary judgment in this matter.

III.    DISCUSSION

    A.   Plaintiffs' Claim for Breach of Contract (Count I)

    Plaintiffs argue that taken together, the LOI and Tolling
Agreement create a binding agreement to sale.  Plaintiffs
admit that neither of the agreements contain an integration
clause, and that the LOI standing alone does not constitute a
contract for the sale of Aceros's assets.  Plaintiffs contend
that a jury must determine whether the LOI, Tolling
Agreement, and oral representations made by ELG to Aceros
culminated in a "meeting of the minds."

    This argument is flawed for several reasons.  First, the
fact that Section 10 of the LOI explicitly states that it was
not the intention of the parties to be bound is particularly
compelling in this case.  Specifically, the LOI was non-
binding to the final sale of Aceros's assets.  The LOI
imposed no duty on the parties to negotiate the deal to
completion.  Instead, the LOI set forth several conditions
precedent, namely board approval, that were required before

10

the final purchase could be completed.  Because ELG's board
of directors did not approve the asset purchase, the
condition precedent set forth in the LOI was never satisfied.
"It is hornbook law that evidence of preliminary negotiations
or an agreement to enter into a binding contract in the
future does not alone constitute a contract."  Channel Home
Centers v. Grossman, 795 F.2d 291, 298 (3d Cir. 1986).
Especially here, where the LOI explicitly states that the
parties did not intend to be bound, and clearly contemplated
final transaction documents regarding the sale of Aceros's
assets, we find that the LOI is nothing more than it purports
to be:  a non-binding letter of intent.

    As to the Tolling Agreement, the parties agree that it is
a valid agreement, however, they disagree as to its scope and
termination.  In the Tolling Agreement, the parties agreed
that ELG would operate Aceros's facility for the fee of
$20,000 per month.  In fact, ELG operated the facility from
September 2001 through June 2002 and paid plaintiffs a
monthly fee until ELG terminated the agreement.  Plaintiffs
argue that the Tolling Agreement must be read with the LOI,
and that when read together, the Tolling Agreement was an
asset purchase agreement with a provision permitting ELG to
rent Aceros's facility pending finalization of the asset
purchase deal.

11

We disagree with plaintiffs. If the parties intended the Tolling Agreement to be incorporated with the LOI, they should have included an incorporation clause. As such, the Tolling Agreement is an independent writing, separate and apart from the LOI, and has no binding effect over the sale of Aceros's assets to defendants.

Plaintiffs' claim that defendants breached their duty to negotiate in good faith is also unavailing. In Channel Home Centers, 795 F.2d at 299, the Court of Appeals reviewed whether Pennsylvania recognizes an agreement to negotiate in good faith. The court set forth three factors to consider in determining whether an agreement to negotiate in good faith exists: (1) whether both parties manifested an intention to be bound; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration. Channel Home Centers, 795 F.2d at 299.

Here, the parties expressly agreed that the LOI was non-binding. As such, there is no duty to negotiate in good faith. We need not consider the other two prongs set forth in Channel Home Centers. Accordingly, summary judgment is appropriate as to plaintiffs' breach of contract claim.

B. Plaintiffs' Claims for Unjust Enrichment and Promissory Estoppel (Counts II and III)

Plaintiffs equitable claims must also fail because this

12

dispute is subject to a contract, either the LOI or the Tolling Agreement, or both. Equitable claims cannot survive where a contract exists. Iversen Baking Co. v. Weston Foods, 874 F.Supp. 96, 102 (E.D. Pa. 1995).

In Iversen, the court dealt with a similar contractual dispute. Iversen Baking Co., 874 F.Supp. at 102. In that case, two contracts were at issue. Id. The parties disagreed as to which contract governed the dispute, however neither party argued that the contracts were invalid. Id. Just as Aceros argues here, the plaintiffs in Iversen argued that their promissory estoppel claim was brought in the alternative in case the court found that the second agreement did not incorporate the first agreement between the parties. Id. Ruling for defendants, the court stated that plaintiffs' rationale "ignores the fact that this Court has found valid contracts and the parties agree that the [first agreement] is a valid contract." Id. The court held, "promissory estoppel is an equitable remedy to be implemented only where there is no contract; it is not designed to protect the parties who do not adequately memorialize their contracts in writing." Id.

Although the parties disagree as to the terms of the two writings at issue here, they do not dispute that one or both of the writings govern this dispute. Here, as in Iversen, plaintiffs' equitable claims for relief can be "implemented

13

only where there is no contract." Iversen, 874 F.Supp at
102. Neither party disputes that a valid contract - whether
it be the LOI, the Tolling Agreement, or both - exists here.
The law does not entitle plaintiffs to an equitable remedy
for failing to adequately memorialize their agreements in
writing. Thus, summary judgment is appropriate as to
plaintiffs' promissory estoppel and unjust enrichment claims.

C. Plaintiffs' Claim for Negligent Misrepresentation
    (Count IV)

Defendants argue that plaintiffs' negligent
misrepresentation claim is simply their contract claim
"masquerading as a tort claim," and as such, is barred by the
"gist of the action" doctrine. We agree.

The gist of the action doctrine is "designed to maintain
the conceptual distinction between breach of contract claims
and tort claims by precluding plaintiffs from recasting
ordinary breach of contract claims into tort claims."
Williams v. Hilton Group PLC, 2004 WL 516165 at *1-2 (3d Cir.
2004). The doctrine is based on the rationale that "tort
actions lie for breaches of duties imposed by law as a matter
of social policy, while contract actions lie only for
breaches of duties imposed by mutual consensus agreements
between particular individuals." Id.

In Williams, plaintiff argued that defendant induced
him into signing a Letter of Intent and dealing with

14

defendant by lying about defendant's intent to honor the
agreement.  Id.  The court dismissed plaintiff's fraudulent
misrepresentation claim, reasoning that it was barred by the
gist of the action doctrine.  Id.  The court stated:

> [Plaintiff's] tort claims are all founded on
> [defendant's] agreement to grant him exclusive
> right to purchase the North American assets
> during the due diligence period.  [Plaintiff and
> defendant] are sophisticated parties who were
> well able to protect their rights in relation to
> this matter by contract, and they attempted to
> do so.  [...]  The "gist" of [plaintiff's] claim
> sounds in contract, not tort.

Id.

Here, as in Williams, plaintiffs' negligent
misrepresentation claims stem from "breaches of duties
imposed by mutual consensus agreements" between the parties,
rather than traditional tort actions, which are derived from
"matters of social policy."  Williams, 2004 WL 516165 at *1-
2.  Plaintiffs attempted to protect their rights by
contracting with defendants not once, but twice.  While we
sympathize with plaintiffs' predicament, their failure to
adequately protect their rights via contract does not create
an action in tort.  Here, any alleged misrepresentations made
by ELG personnel to plaintiffs were so closely related to the
parties' written agreements, namely the LOI, that as a matter
of law, they cannot be raised as an independent cause of
action.  Plaintiffs' negligent misrepresentation claim, which

15

is based on certain assurances made by Mr. Teroerde of ELG to
Mr. Greer of Aceros that the final sale of plaintiffs' plant
was imminent, is so "inextricably intertwined with the
contract claims," that it is barred by the gist of the action
doctrine. See Williams, 2004 WL 516165 at *1-2 (quoting
eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10
(Pa. Super. Ct. 2002)).

In summary, plaintiffs have failed to establish any
evidence by which a jury acting reasonably could conclude
that plaintiffs' negligent misrepresentation claims stem from
something other than plaintiffs' contractual claims. As
such, summary judgement is granted as to Count IV.

IV. CONCLUSION

Accordingly, this 13th day of March, 2006, upon
consideration of defendant's motion for summary judgment
[document no. 26], IT IS HEREBY ORDERED that defendant's
motion is GRANTED.

BY THE COURT:



J.

cc: All Counsel of Record

16